UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUSTIN GIBBS,

        Plaintiff,

    v.

ABT ELECTRONICS, INC. and RICKY ABT,

        Defendants.

No. 21 CV 6277

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Plaintiff Justin Gibbs sued his former employer, defendant Abt Electronics ("Abt"), and its owner, defendant Ricky Abt ("Ricky"), under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Illinois Human Rights Act, 42 U.S.C. § 1981, and the Illinois Wage Payment and Collection Act. Defendants now move for summary judgment on all claims. [167]. For the reasons given below, that motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.     Background

The following facts are undisputed except where noted.

Gibbs is Black and has vitiligo, "an autoimmune disease which causes his skin to lose its pigmentation in patches which grow bigger over time." [19] ¶¶ 10–11.[1] Gibbs worked for Abt from February 20, 2017, until his April 18, 2020 termination. [177] ¶ 1. Gibbs was hired as a delivery helper and reported to delivery fleet manager William Govis throughout his tenure. *Id.* ¶ 8. Helpers formed two-person delivery teams with delivery leads, who are "the face" of the delivery truck and are usually the more senior employee. *Id.* ¶ 10. Both the helper and lead can drive the truck if they are licensed to do so. *Id.*

### A.     Abt Policies

Gibbs identifies two Abt policies that, he says, violated his rights under federal law: what he describes as "unfair scheduling and delivery assignments" that "singled out Gibbs and his Black co-workers for unfair treatment," [19] ¶ 42, and automatically deducting meal breaks from employees' time even when employees did not take the break, *id.* ¶¶ 54–58.

Abt uses a software program to manage its deliveries. [177] ¶ 72. Within the program, each delivery team is assigned a defined geographic area and a "speed factor"—essentially, how fast or slow a team typically completes assignments—which

---

[1] Gibbs does not refer to either his race or medical condition in his Local Rule 56.1 Statement or present any record evidence—for example, his own declaration—that would establish these elements of his claims. Defendants do not, however, dispute either Gibbs's race or the fact of his vitiligo, so the Court will treat these assertions as factually true when resolving this motion.

the program uses to plan daily routes and schedule deliveries. *Id.* ¶¶ 73–75. Abt sets the number of hours to be worked but does not set an end time, as teams end their day when their assignments are finished. *Id.* ¶¶ 76, 78.

During these delivery assignments, Abt requires the team to take a one-hour paid meal break at some point of their choosing, and that one-hour break is automatically deducted from their recorded hours. *Id.* ¶¶ 52–53. Defendants assert that they cannot know when these breaks are taken. *Id.* ¶ 52. Gibbs denies that assertion because "Abt tracked the trucks through GPS," *id.*, though Gibbs does not explain how Abt would use GPS to determine that a particular stop represented a meal break (versus a prolonged delivery). Defendants assert that if an employee "was unable to take their meal break, or voluntarily chose not to take their meal break, they were required to notify Abt Electronics of the same so the company could pay them for the hour of time." *Id.* ¶ 54. Gibbs denies this, *id.*, but in doing so relies on deposition testimony from his former delivery partner that merely confirms that the meal breaks were deducted automatically and does not address whether employees could notify Abt to receive compensation for missed breaks, *see* [179-6] at 36:8–12.

## B.    Complaints By and About Gibbs

Throughout his tenure at Abt, Gibbs experienced issues with several employees with whom he was partnered. In July 2019, Gibbs met with Govis, Abt human resources director Becky Stavin, and Abt human resources manager Stefan Johnson to discuss an altercation between him and another employee. [177] ¶ 57. (No party explains the nature of this altercation or identifies who that employee was.)

At this same meeting, Gibbs told the Abt managers that a second Abt employee used the N-word around Gibbs in December 2018 and February 2019, and that a third Abt employee used (at some unspecified time) the same racial slur in a social media post that was not directed at Gibbs. *Id.* ¶ 58. Also at this July 2019 meeting, Gibbs related that in August 2017, a fourth Abt employee, who is described as having "a learning disability that impairs his social communication skills," told Gibbs that he liked the way Gibbs's skin looked, that Gibbs's skin was "cool," and that this fourth Abt employee said he wanted his skin to look like Gibbs's skin. *Id.* The second and third Abt employees had both been terminated by July 2019, though no party provides the reason for those terminations. *Id.* ¶ 59. The parties dispute whether the fourth Abt employee was disciplined for his comments about Gibbs's skin. *Id.* ¶ 62.

A fifth Abt employee, Santos Chico, used the N-word against Gibbs in March 2018, but there is no evidence that this incident was discussed at the July 2019 meeting. *Id.* ¶ 60. Defendants assert that the incident with Chico was not raised at all until Gibbs filed his charge with the Equal Employment Opportunity Commission in June 2020. *Id.* Gibbs says that he informed Govis of Chico's use of the slur (though Gibbs does not say when he did so) and, at Gibbs's request, Govis assigned Gibbs a new partner, delivery lead Shane Wideman. *Id.*; [179-1] ¶ 14. That pairing took place in approximately September 2018. [177] ¶ 11.

In November 2019, Gibbs's then-delivery partner, Brian Artwohl, complained that Gibbs was "creating an uncomfortable work environment," that he "wasted company time" by refusing to assist Artwohl during deliveries, was "combative and

argumentative" with Artwohl at times, failed to communicate effectively [with] others, and complained about Abt management at a customer's house, creating "a very uncomfortable vibe." *Id.* ¶ 29. Artwohl requested Gibbs be reassigned after three days working with him. *Id.* ¶ 32. Gibbs purports to deny the substance of Artwohl's complaint (Gibbs cites nothing in the record contradicting the specific allegations lodged against him) and admits that Artwohl made it. *Id.* More generally, Gibbs simply asserts that he had a good work ethic and got along with other co-workers, like his former delivery partner Curt Heller. *Id.*; [179-6] at 33:17–24.

Also in November 2019, Ricky told Gibbs that he did not like the way the full-face ski mask Gibbs wore during deliveries appeared to customers and instructed him to stop wearing it. [177] ¶ 34. Gibbs's complaint alleges that "Gibbs then wore and continues to wear today a facemask at times, particularly during cold weather, due to his Health Conditions," [19] ¶ 76, though in opposing the instant motion, Gibbs cites to no record evidence explaining how a full-face ski mask relates to any personal health condition. Instead, Gibbs concedes that he "never advised [Ricky] … at any point throughout his employment … that he allegedly needed to wear a full-face ski mask for his alleged disability" and also that he testified that "he did not require any accommodation of any kind in order to perform the essential functions of his job." [177] ¶ 35.

### C.    Gibbs's Performance Issues and Termination

Abt uses a "discretionary bonus fund" both as a method of evaluating employee performance and as an incentive program. *Id.* ¶ 12. Every four months, Abt deposits money in a "bonus fund" for each employee. *Id.* If an employee performs well, Abt

issues a "learning letter" reflecting the good performance and adds to the fund. *Id.* If the employee has performance issues, Abt issues a learning letter reflecting that issue and deducts money from the fund. *Id.* A positive balance is paid out at the end of the month, while a negative balance carries over. *Id.* Employees can request that a negative learning letter and related deduction be retracted. *Id.* ¶ 13. A negative balance at the end of a four-month period is grounds for termination. *Id.* ¶ 14.

Gibbs maintained a positive balance in his bonus fund through October 2018. *Id.* ¶ 16. But from November 2018 through February 2020, Gibbs maintained a negative balance. *Id.* ¶ 17. These negative amounts stemmed in part from learning letters that Gibbs—along with many other Abt employees—received because of urine bottles found inside "junk appliances" and Abt delivery trucks. *Id.* ¶¶ 22–24. Gibbs also received learning letters and bonus-fund deductions because he failed to complete required safety trainings and to wear steel-toed safety boots. *Id.* ¶ 25. In March 2020, the manager overseeing delivery-personnel bonus funds asked Abt's Johnson whether Gibbs could be discharged based on his negative balances. *Id.* ¶ 18. Ricky ultimately decided against terminating Gibbs at that point; he wanted Gibbs to "stick around." *Id.* ¶ 19.

On October 10, 2019, Gibbs told Ricky that manager Govis had sent him a "poop emoji" via text message. *Id.* ¶ 63. Gibbs did not precisely understand the intended meaning of this communication—for example, in his deposition Gibbs speculated that Govis may have been calling him "a piece of shit"—but, at bottom, Gibbs found the text message to be "disrespectful," "degrading," and "retaliatory." *Id.*

¶ 64. The local police department was called over the text, though the parties disagree why the police were called and who called them. *Id.* ¶ 65. On October 15, a police officer came to the Abt store to complete a report related to the text message. *Id.* ¶¶ 68–69. Gibbs told the police officer that he did not think Johnson cared about his feelings, and that after Gibbs said as much to Johnson, Johnson had responded "I don't give a damn about your feelings" and told Gibbs "to stop acting like such a victim." *Id.* ¶ 69. Gibbs relayed this interaction with Johnson to another manager via email on October 23, 2019, and expressed that it made him feel "belittled and uncomfortable." *Id.* ¶ 70.

Gibbs was ultimately terminated in April 2020. *Id.* ¶ 1. According to defendants, the precipitating incident was Ricky observing on April 14, 2020, that Gibbs was not wearing his required steel-toed safety boots at work despite the earlier learning letters. *Id.* ¶ 37. In the declaration that Gibbs submitted as part of his opposition to defendants' motion for summary judgment, Gibbs asserted that he was wearing his boots at that time, *id.*; [179-1] ¶ 9, though this assertion contradicts his previous deposition testimony, *see* [181-1] at 9 ("I walked in the warehouse; I had some gym shoes on; and I had always kept my steel toe boots in the car.").[2]

---

[2] Although the Court denied defendants' motion to strike [181] for failing to comply with its standing orders, [185], the Court considers the excerpted testimony from Gibbs's deposition that defendants attached to their motion to strike because, under the Court's standing orders, parties are directed to provide the entire transcript of deposition testimony submitted to support their positions. Hence, the excerpted testimony from Gibbs's deposition submitted with defendants' motion to strike was, in fact, an item that defendants were permitted (indeed, expected) to submit with their Local Rule 56.1 statement. *See* [169-5] (excerpts of Gibbs's deposition testimony submitted in support of motion for summary judgment).

During their encounter on April 14, 2020, Ricky maintains that he inquired about Gibbs's bonus fund and encouraged him to speak to an Abt manager about that subject "as it's important." [177] ¶ 38. Ricky felt that Gibbs was "dismissive" and "had a poor attitude" during this conversation. *Id.* ¶ 40. Gibbs disputes the characterization of the conversation—both as to its content and his demeanor during it. *Id.* ¶ 38; [179-1] ¶¶ 10–11. But he does not dispute that Ricky "had no intention of terminating [Gibbs's] employment" at this time. [177] ¶ 40. Ricky later was told by another Abt employee that Gibbs was "bitching" after Ricky ended his encounter with Gibbs. *Id.* ¶ 41. Gibbs denies that he was "bitching," but does not deny that Ricky was told that he was. *Id.*

On April 17, 2020, Gibbs requested his personnel file from Stavin via email, asking that it be sent to Gibbs's attorney. [184] ¶ 32. Because Stavin was on maternity leave at the time, Gibbs sent the same request to the general HR email address at Abt. *Id.*; [184-8]. Defendants assert that Ricky was unaware of this request

when he terminated Gibbs. [177] ¶ 50; [179-5] at 107:19–25 (Q: "Were you aware of my client being represented at any time prior to his termination?" … [Ricky]: "No.").[3]

Ricky and Abt employee Tony Andrade met with Gibbs on April 18, 2020, to discuss his bonus fund. [177] ¶ 42. Defendants again assert that Gibbs was "dismissive" and had a "poor attitude" at this meeting, which Gibbs again denies. *Id.*; [179-1] ¶ 11. Ricky "asked [Gibbs] why he continued to work for Abt Electronics if he was unhappy there," and Gibbs replied that he had been happy at Abt before Abt employees had referred to him using racial slurs. [177] ¶ 43. Defendants assert that Gibbs then approached Ricky and Andrade in what they perceived as a "threatening and intimidating" manner, which Gibbs denies. *Id.* ¶ 44; [179-1] ¶ 12. Ricky sent

---

[3] Gibbs disputes this assertion by Ricky, [177] ¶ 50, but to support the purported divergence, Gibbs cites deposition testimony in which Ricky answered "I believe so," in response to the following question: "If an attorney contacts Abt, and they contact their HR department, is that something that you would be notified of as the co-president?" *Id.*; [179-5] at 108:12–16. The cited testimony does not actually contradict defendants' assertion that Ricky did not know Gibbs had retained a lawyer and, more significantly, that Ricky did not have this information before Gibbs was terminated. Gibbs separately asserts that he "told Ricky directly that he retained counsel," [180] at 13, but Gibbs cites no record evidence to support that assertion. Gibbs also argues that Ricky knew Gibbs hired an attorney because "there is no question HR knew," because Johnson worked in HR, and because Ricky spoke to Johnson before terminating Gibbs. *Id.* Based on the record evidence, however, no reasonable jury could conclude that Ricky knew Gibbs had retained an attorney when Gibbs was terminated. The evidence supports only that, as a general matter, Abt's HR department informs Ricky at some point after an attorney contacts the company, but there is no evidence cited about how promptly Ricky is typically notified. Moreover, the evidence indicates that, in these particular circumstances, any notification of Ricky would have been more delayed than usual. Gibbs notified HR that he had retained an attorney, first, by emailing a temporarily unattended-to inbox and, next, by emailing a general departmental inbox rather than a specific individual, such as Johnson. Furthermore, there is no evidence in the record as to which Abt employees check the general departmental inbox and how frequently they do so. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 897 F.3d 835, 841 (7th Cir. 2018) ("Speculative assertions about decisionmakers' knowledge are insufficient to establish a genuine dispute about a material fact."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage.").

Gibbs home and told him that he would "contact [him] later to notify him of his status at the company." [177] ¶ 46.

After Gibbs left, Ricky discussed whether to terminate Gibbs with Govis, Andrade, and Johnson and decided to do so that afternoon. *Id.* ¶ 47. (Gibbs denies that Ricky spoke to Andrade, *id.*, but the cited portion of Ricky's deposition transcript does not support that denial.) Defendants assert that Ricky called Gibbs the afternoon of April 18, 2020, and left a voicemail asking Gibbs to call him back when Gibbs did not answer. *Id.* ¶ 48. Gibbs denies receiving a voicemail about termination, though he does not dispute receiving a voicemail. *Id.*; [179-1] ¶ 13. Govis then sent a text message to Gibbs about the termination on April 19, 2020. [177] ¶ 49. Gibbs applied for unemployment benefits after his discharge but was denied those benefits by the Illinois Department of Employment Security because he was terminated for "repeatedly violating known company polices" and "misconduct connected with the work." *Id.* ¶ 51; [169-35] at 2.

## III. Analysis

### A. Adequacy of Gibbs's Local Rule 56.1 Response and Statement of Additional Material Facts

As it did in its previous summary judgment order in this matter, [162] at 3, the Court again starts with Local Rule 56.1, which requires the responding party, paragraph by paragraph, to explain whether each fact is disputed, and if so, to cite the evidentiary material that establishes the dispute. N.D. Ill. Local Rule 56.1(b)(2), (e)(2)–(3); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019) (explaining that the Northern District's Local Rule 56.1 "aims to make

10

summary-judgment decisionmaking manageable for courts"). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3). *See also* Fed. R. Civ. P. 56(e)(2); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010). ("[A] district court may strictly enforce compliance with its local rules regarding summary judgment motions.").

In many instances, Gibbs has failed to comply substantively with Local Rule 56.1 by failing to cite record evidence that adequately supports his assertions of fact or his denials of defendants' assertions. For example, Gibbs relies heavily on his own declaration. *See* [179-1]. Such "self-serving" declarations can be adequate to defeat summary judgment "provided that they meet the usual requirements, such as being based on personal knowledge and setting forth specific facts showing that there is a genuine issue for trial." *McGowan v. Deere & Co.*, 581 F.3d 575, 580 (7th Cir. 2009). Some assertions in the declaration are clearly based on personal knowledge and are thus usable evidence. *See, e.g.*, [179-1] ¶ 11 (asserting Gibbs "did not have a poor attitude toward Ricky Abt"). But Gibbs does not explain how he acquired knowledge of matters like the disciplinary records of other employees, *id.* ¶ 8, or how defendants treat immigration status in hiring, *id.* ¶ 3. And other assertions that are plausibly based on personal knowledge, like whether "employees who had not been with Abt longer than [Gibbs] but were elevated to Lead," *id.* ¶ 4, are so lacking in "specific facts" that they could not show a "genuine issue for trial," *McGowan*, 581 F.3d at 580.

As it did in the earlier background section, in the following analysis the Court will continue to note where Gibbs has failed to adequately support or dispute a dispositive factual assertion.

## B.    Timeliness

Defendants argue that many instances of alleged harassment cannot be considered because they are untimely. [168] at 3–5. Because Gibbs's EEOC charge was filed on June 11, 2020, [16-1] at 2, events before August 16, 2019—300 days before filing—generally would fall outside the applicable statutory time period shared by Gibbs's Title VII, ADA, and IHRA claims. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII charges "shall be filed … within three hundred days after the alleged unlawful employment practice occurred"); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004) ("[A]n employee may sue under the … ADA only if he files a charge of discrimination with the EEOC within 300 days"); 775 ILCS 5/7A-102(A-1) (2019) (same for IHRA).

Gibbs contends that the Court should consider the pre-August 2019 incidents because they represent a "pattern of ongoing harassment and discriminatory treatment from 2017 through [Gibbs's] termination in 2020, including repeated use of the N-word, mocking his disability, differential scheduling and discipline, and retaliation" and thus constitute a so-called "continuing violation." [180] at 4 (citing *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707–08 (7th Cir. 2002)). Gibbs has advanced this argument before. The district court previously assigned to this matter, when resolving an earlier motion to dismiss Gibbs's complaint, concluded that Gibbs could not rely on the continuing violation doctrine "to save his Title VII claims" in

light of the allegations advanced in his then-operative complaint. [18] at 8. *See also id.* at 9 and 12 (concluding the same with respect to Gibbs's ADA and IHRA claims). In response, Gibbs amended his complaint and expressly limited his Title VII (and ADA and IHRA) claims to "acts occurring on or after August 16, 2019." [19] at 11–14, 16. In opposing defendants' motion for summary judgment, Gibbs does not explain how he can prevail at this stage of the litigation by relying on a legal theory that the earlier court found unsupported by Gibbs's contentions and that Gibbs himself effectively disavowed in his amended, and now operative, complaint.

Setting that obstacle aside, Gibbs also does not explain how all of the alleged discriminatory incidents "formed a single unlawful employment practice that reached into the statutory period." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017). He does not make any effort to connect the use of racial slurs by coworkers from February 2019 and earlier to any instances of alleged discrimination that took place within the statutory period, like the "poop emoji" text, the bonus-fund deductions that resulted from the discovery of urine bottles in Gibbs's truck and Gibbs's failure to wear steel-toed work shoes, and his eventual termination. He does not explain how "repeated use of the N-word," insults directed to his disability, and Abt's post-termination retaliatory conduct involve the same subject matter. *See Tinner*, 308 F.3d at 708 (in evaluating whether discrete acts constitute a continuing violation, one factor courts consider is "whether the acts involve the same subject matter"). And he does not explain why being called a racial slur, particularly one as vile as the N-word, multiple times during the pre-statutory period does not preclude

his invocation of the continuing violation doctrine. *See Filipovic v. K & R Exp. Sys., Inc.*, 176 F.3d 390, 396 (7th Cir. 1999) (rejecting argument that although plaintiff was allegedly "taunted with ethnic slurs from his supervisors and coworkers on almost a daily basis," it was "only over time that [he] could have become aware that the name-calling was part of a discriminatory pattern") (alteration in original).

In addition, although chronological gaps between alleged discriminatory acts are not necessarily fatal to the application of the continuing violation doctrine, the Seventh Circuit has held that "unspecific, speculative allegations cannot connect otherwise distant allegations into a single employment practice." *Milligan-Grimstad*, 877 F.3d at 713. Here, Gibbs makes no effort to connect these dots. His analysis of the continuing violation doctrine's applicability to his allegations is so cursory that he fails to provide even a single citation to the factual record to support it. *See* [180] at 4–5. It is well established that "[a]rguments that are underdeveloped, cursory, and lack supporting authority are waived." *Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1063 (7th Cir. 2020).

Even on the merits, however, based on what Gibbs has managed to articulate and in light of the pertinent caselaw, for the reasons given above, the Court does not perceive "a single unlawful unemployment practice" that justifies application of the continuing violation doctrine. *Milligan-Grimstad*, 877 F.3d at 712. The Court therefore only considers conduct within the statutory period for the purpose of Gibbs's discrimination claims. Of course, conduct outside the statutory period can be

14

considered as background evidence and for context, *see Kellogg v. Ball State Univ.*, 984 F.3d 525, 529 (7th Cir. 2021), and the Court does so if and when appropriate.

### C. Discrimination

Gibbs next argues that he has "presented ample evidence of discrimination under Title VII, the ADA, and the IHRA," as well as § 1981. [180] at 5, 22. But these arguments also fail.

To succeed on a Title VII claim, Gibbs must prove that "(1) he is a member of a class protected by the statute, (2) that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and (3) that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (cleaned up). The standards for § 1981 and IHRA discrimination claims are "essentially identical" to that of the Title VII claim, such that the Court "need not analyze them separately." *Bagwe v. Sedgwick Claims Mgmt. Services, Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016). "To prevail on a[n ADA] disparate treatment claim, a plaintiff must show (1) he was disabled, (2) he was qualified to perform essential functions with or without reasonable accommodation, and (3) his disability was the 'but for' cause of the adverse employment action." *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 632–33 (7th Cir. 2020).

Defendants do not dispute that Gibbs is Black or that he has vitiligo. But, at the threshold, Gibbs's ADA claims fail because he has not provided any explanation for why his vitiligo qualifies as a disability under the ADA. In the context of the ADA, the term "disability" means "a physical or mental impairment that substantially

limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Gibbs describes vitiligo as a "visible skin disability," [184] ¶ 12, but provides no other details about the condition or any evidence suggesting that it "substantially limits one or more major life activities." There is thus no evidence from which a jury could determine that Gibbs has a disability for the purpose of the ADA, and his ADA claims must fail. *See Arce v. Aramark Corp.*, 239 F. Supp. 2d 153, 166–67 (D.P.R. 2003) (granting employer's motion for summary judgment when plaintiff failed to prove that he was a qualified individual with a disability because he did not present admissible evidence that his vitiligo substantially limited a major life activity); *Fee v. Mgmt. & Training Corp.,* No. 3:12-CV-00302-RCJ, 2012 WL 4792920, at *3 (D. Nev. Oct. 9, 2012) (noting that "courts typically reject claims that skin conditions constitute a disability under the ADA" and otherwise requiring "an individualized analysis").

As to the remaining discrimination claims, each requires that Gibbs have been subject to an adverse employment action. *Abrego*, 907 F.3d at 1004. Gibbs asserts that he experienced "numerous adverse employment actions," including "the denial of promotion/lead opportunities; unfair scheduling and delivery assignments; disproportionate discipline (urine bottle, safety issues); manipulation of bonus fund through fines and denied reversals; harassing conditions and intimidation; [and] suspension and termination." [180] at 5–6.

The first two alleged adverse actions, unfair scheduling and denial of promotion, are supported only by citations to Gibbs's complaint, rather than the

factual record. *See id.* at 5, 8, 23. "This is not sufficient to meet his burden at summary judgment, as a plaintiff must do more than simply point to the allegations in his complaint." *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017). Gibbs argues that "[e]vidence shows Plaintiff and his Black coworker were consistently given more burdensome routes than similarly situated non-Black employees, and that supervisors called Plaintiff's partner multiple times despite no performance issues" and that this creates "classic disputes for a jury." [180] at 8. Gibbs does not, however, identify what evidence shows this, nor does he explain how a supervisor calling Gibbs's partner would relate to some claim of discrimination. Any arguments regarding the scheduling are therefore unsuccessful, if not waived. *See Shipley*, 947 F.3d at 1063. Likewise, the only argument Gibbs makes regarding his lack of promotion is that "Chico was promoted without credentials while Plaintiff was denied promotion," with no citation to any factual assertion or record evidence. [180] at 23 (citing only [19] ¶¶ 47-53, which are allegations in the first amended complaint). This argument therefore also lacks merit, assuming it has not been waived outright given its hasty treatment.

Gibbs also argues that "disproportionate discipline," especially the deductions assessed to his bonus fund, provides a basis for his claims of racial discrimination. [180] at 9. This argument appears to be largely based on the learning letter issued to Gibbs on August 29, 2019, in which Gibbs was fined $500 for leaving a urine bottle in

his truck. *Id.*; [177] ¶ 23.[4] Gibbs does not dispute that the bottle was his and concedes that "at least 38 other employees received nearly identical Learning Letters … with the same accompanying $500 deduction" around the same time. [177] ¶ 23.

Instead, relying solely on his declaration, Gibbs asserts that Chico, who is not Black, received a refund of the fine after contesting it, while Gibbs did not receive a refund and was not even "allowed [the] right" to contest the fine. *See* [179-1] ¶ 6; [177] ¶ 13; [180] at 9, 23. But Gibbs does not explain the circumstances of Chico's refund and, critically, does not explain the source of his knowledge of it. That means Gibbs's allegation that a co-worker might have gotten a fine refunded for unstated reasons is not enough to create a genuine dispute of material fact about whether an instance of "disproportionate discipline" is an adverse employment action under Title VII. *See Phillips v. Baxter*, No. 23-1740, 2024 WL 1795859, at *2 (7th Cir. Apr. 25, 2024) (district court did not abuse its discretion by "disregard[ing] factual assertions or responses that were unsupported by admissible evidence, as the rules for summary judgment require"); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015) ("The affidavit was entitled to no weight, as it had no foundation.").

---

[4] Gibbs alludes to several other instances of disproportionate discipline, *see, e.g.* [180] at 6 ("Artwohl … tested positive for THC several times and was not disciplined."); *id.* at 7 ("The bonus fund was manipulated through selective discipline); *id.* at 9 ("[o]ther employees … received only $25 or $50 fines; [Gibbs] received the maximum."); *id.* at 10 ("The record shows other employees violated the same policies and were not disciplined."), but he cites no admissible record evidence that support these assertions.

18

Moreover, "not everything that makes an employee unhappy will suffice to meet the adverse action requirement. Rather, an employee must show that material harm has resulted from the challenged actions." *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015) (cleaned up). Based on the dearth of evidence to which Gibbs points, he cannot identify a harm that resulted to him from any refund Chico may have received. Likewise, even if the Court assumes Chico is a valid comparator,[5] Gibbs has not identified how this incident connects to his race (besides the fact that Chico is not Black), and "[a]lthough a connection between the harassment and the plaintiff's protected class need not be explicit, there must be some connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016); *see also* [179-5] at 69:18–23 (Ricky discussing the circumstances under which a fine might be retracted).

There is record evidence related to Gibbs's claims of harassment—in particular the use of racial slurs by co-workers. But, as discussed above, any incidents that occurred prior to August 16, 2019, are untimely and can only be used as context for timely incidents. The timely incidents of alleged harassment Gibbs identifies are: (1) Johnson telling Gibbs: "I don't give a shit how you feel"; (2) the "poop emoji" text sent

---

[5] Gibbs asserts that "numerous non-Black or non-disabled employees were treated more favorably than [Gibbs]" with regard to urine bottle discipline, [180] at 6, but does not identify any apart from Chico, does not provide foundation for this assertion, and points to no record evidence suggesting they are similarly situated to Gibbs.

to Gibbs allegedly by Govis; (3) the police response to the "poop emoji" text; and (4) Govis later being awarded Employee of the Year. [180] at 16. To establish a hostile work environment claim, Gibbs must "show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023).

Gibbs's harassment claims run aground for lack of evidence that might create a genuine dispute of material fact. While the "poop emoji" text is incredibly unprofessional, Gibbs does not attempt to explain how it is connected to either his race or disability, and he concedes that "he does not know the significance of the poop emoji." [177] ¶ 64; [168] at 16. Likewise, while it appears that Johnson did call the police following the poop-emoji transmission, [169-12] at 21:13–18, nothing in the record supports Gibbs's assertion that Abt "called the police on [Gibbs] to intimidate him." [180] at 13. No one disputes that "*Govis* was promptly arrested for disorderly conduct" after the emoji incident. [184] ¶ 24 (emphasis added). Gibbs does not explain how the police promptly arresting the man who allegedly sent him an insulting text message could constitute harassment of Gibbs. Gibbs also points to no evidence indicating how the police call might relate to any protected characteristic.

Johnson's comments to Gibbs and the Abt award to Govis present similar, fatal issues. Gibbs does not explain how either incident was motivated by some protected characteristic. He does not, for example, assert that Johnson made racially offensive comments, or treated non-Black employees differently. Further, "[i]nsults, personal

animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance," something Gibbs does not assert. *See Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022). Even if, as Gibbs asserts, the award to Govis was intended as some sort of reward for the alleged harassment of Gibbs, *see* [180] at 14—and the record reflects no evidence indicating this is the case—Gibbs does not explain how this could meet the severe and pervasive threshold. Gibbs thus has not established a genuine dispute of material fact as to his hostile workplace claims.

"Without question, termination is an adverse employment action." *Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 921, 931 (N.D. Ill. 2014). Defendants argue that Gibbs was terminated for legitimate, nondiscriminatory reasons—his negative bonus fund balance and his "poor attitude" and "threatening" behavior during the April 18, 2020 discussion with Ricky—and that Gibbs cannot show that these reasons are pretextual. [168] at 11–13. Gibbs does not dispute that "[a] negative balance at the end of a four-month bonus period is grounds for termination" under Abt's policies, [177] ¶ 14, or that he had a negative balance when he was terminated, [180] at 12. Instead, Gibbs contends that defendants have provided "shifting explanations," which "alone require denial of summary judgment," and that the "bonus fund justification is pretextual and selectively applied." *Id.* at 11–12.

"Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *McCann v. Badger Mining Corp.*, 965 F.3d 578, 589–90 (7th

Cir. 2020) (cleaned up). Gibbs argues that "Defendants have claimed at least five different reasons for termination: negative bonus fund; failure to wear boots; poor attitude; customer complaints; and 'threatening' behavior in the April 18 meeting," but this argument is not sufficient to support a theory of pretext. [180] at 11–12. Gibbs does not explain why a reasonable jury would not view these reasons as *inconsistent* rather than *cumulative*. *See Lee v. Mostyn Law Firm*, CIV.A. H-04-3473, 2006 WL 571859, at *5 (S.D. Tex. Mar. 6, 2006) ("The fact that Defendant may have had several cumulative reasons for terminating Plaintiff–reasons that Defendant has consistently asserted and has substantiated with ample summary judgment evidence–does not satisfy Plaintiff's burden of offering some evidence that permits an inference that Defendant's proffered reasons for her termination were a pretext for discrimination."). That Gibbs had a negative bonus fund is not inconsistent with the assertion that he was not wearing work boots—indeed, he does not dispute that was one cause of the negative balance—or with the assertion that Ricky found his attitude to be poor, including when Ricky interacted with Gibbs on April 14, 2020, after Ricky saw that Gibbs was not wearing his work boots. *See supra* at 7. Any alleged inconsistency therefore cannot by itself provide evidence of pretext.

Gibbs also points to Ricky's deposition testimony where he stated that he did not know the reason why Gibbs was terminated. [180] at 12. The relevant statement, from the July 12, 2024 deposition, is, in full:

Q:     …[A]nd ultimately Mr. Gibbs was terminated, correct?

A:     Yes.

> Q:   Okay. And do you know the reasons for his termination?
>
> A:   On paper, no. I would guess -- I shouldn't guess. I don't know.

[169-2] at 82: 16–22. This statement is certainly ambiguous, but it is not sufficiently "shifting and inconsistent to permit an inference of mendacity." *McCann*, 965 F.3d at 589–90. From the perspective of a reasonable jury, the fact that Ricky said he could not recall the reason for Gibbs's termination at a deposition almost five years after the fact is not inconsistent with the provided reasons for termination and cannot establish pretext.

Likewise, Gibbs's primary evidence for his argument that the bonus fund was "selectively applied" and thus pretextual is that Gibbs himself "had a negative bonus for 16 months before termination" and that "in March 2020, HR recommended termination based on the bonus fund balance, but Ricky decided not to fire him because he wanted Plaintiff to 'stick around.'" [180] at 12. Gibbs does not present any evidence of the negative bonus fund rule being selectively applied to any other employee. A decision to selectively apply *rules in Gibbs's favor* does not support the inference of pretext: Gibbs argues in essence that Ricky's decision to not terminate Gibbs earlier is evidence that, later on, Gibbs was pretextually fired. But Gibbs receiving more favorable treatment in the past cannot be "evidence that a similarly situated employee *outside [his] protected class* received more favorable treatment." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (emphasis added).

Ultimately, Gibbs concedes that his negative bonus balance was a legitimate reason for termination, and he has not created any genuine dispute of material fact

around whether that reason was pretextual. Gibbs's claims of discrimination based on his termination therefore also fail.

### D.    Retaliation

Gibbs also claims that his termination was retaliatory under the ADA, Title VII, Section 1981, and the IHRA. [180] at 18–21.

With respect to his ADA claim, as discussed above, because Gibbs has not established that his vitiligo was a disability for the purpose of the statute, or was perceived as a disability, he has not created a genuine dispute of material fact regarding his ADA claims.

With respect to his Title VII, Section 1981, and IHRA retaliation claims, to defeat summary judgment, Gibbs "must offer evidence from which a reasonable jury could find: (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (cleaned up); *see also Bagwe*, 811 F.3d at 887–88 (analyzing Title VII, Section 1981, and IHRA retaliation claims together).

As discussed above, the only adverse employment action Gibbs has shown occurred during his employment at Abt was his termination. Gibbs also argues that "contesting unemployment in bad faith" and "banning [Gibbs] from returning to the store as a customer" were adverse actions for the purpose of his retaliation claims. [180] at 19.  The protected activities Gibbs relies on are his various conversations to Govis, Johnson, Stavin, and Ricky—he does not provide specific dates—and the July 2019 meeting where he discussed with Abt managers the racial slurs that had been

used against him. *Id.* at 18–19. Gibbs also argues that his request of his personnel file and the fact he had retained counsel were "classic protected activity," *id.* at 19, though again presents no authority establishing that and develops no argument supporting that contention.

Even if the Court accepts the above, Gibbs has not shown a causal connection between either his termination or post-employment issues and any of the asserted protected activity. Gibbs relies almost entirely[6] on "temporal proximity" to support causation. *Id.* at 20. "Suspicious timing alone, however, is generally insufficient to establish a retaliatory motivation." *Jokich v. Rush Univ. Med. Ctr.,* 42 F.4th 626, 634 (7th Cir. 2022). And, particularly relevant here, "any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action." *Id.*

As discussed above, defendants have provided a legitimate, nondiscriminatory explanation for Gibbs's termination, and Gibbs has provided no evidence from which a reasonable jury could conclude that the explanation was pretextual. Under these circumstances, mere temporal proximity is insufficient to create a genuine dispute of material fact as to whether the asserted protected activities—complaining to managers, requesting a personnel file, and retaining an attorney—had any causal connection to the asserted adverse actions. *See Parker v. Brooks Life Sci., Inc.,* 39

---

[6] Gibbs also makes a cursory argument that "there was escalation after complaints" but again provides no record citations or authority. [180] at 20. This argument is therefore waived. *See Shipley*, 947 F.3d at 1063.

F.4th 931, 937 (7th Cir. 2022) (suspicious timing insufficient without causal connection).

Gibbs has thus not established a genuine dispute of material fact regarding his retaliation claims.

### E.    IWPCA

Finally, Gibbs claims that he was denied wages he was due under Illinois law.

[180] at 25. The Court reproduces Gibbs's IWPCA argument in its entirety:

> The IWPCA requires payment of all earned wages and prohibits unauthorized deductions. 820 ILCS 115/3, 115/9. Automatic deduction of an hour for lunch when employees work through lunch violates the Act, particularly where the employer knows or should know no break was taken.

> Defendants tracked routes via GPS and exercised control over scheduling and workloads, and they were aware employees often could not take breaks. On this record, whether Defendants violated the IWPCA is a classic jury question.

*Id*. It is so cursory and underdeveloped that the Court finds any argument waived. *See Shipley*, 947 F.3d at 1063. Gibbs does not, for example, even assert that the deductions in question were unauthorized for the purpose of the statute, and again fails to support the argument with any record citations or relevant legal authority.

Gibbs has thus not established a genuine dispute of material fact regarding his IWPCA claim.

## IV.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment [167] is granted. All pretrial and trial deadlines are vacated. Civil case terminated.

ENTER:

‌‌‌‌_____
Georgia N. Alexakis
United States District Judge

Date: 1/5/2026